J-S17038-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRANDON OLIVIERI | : | |
| | : | |
| Appellant | : | No. 1803 EDA 2025 |

Appeal from the PCRA Order Entered November 20, 2025
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0010998-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRANDON OLIVIERI | : | |
| | : | |
| Appellant | : | No. 1804 EDA 2025 |

Appeal from the PCRA Order Entered November 20, 2025
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0010999-2017

BEFORE:   PANELLA, P.J.E., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JULY 27, 2026**

Brandon Olivieri appeals from the order[1] dismissing his first petition filed

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although the court issued an order dismissing Olivieri's petition on June 18, 2025, and Olivieri filed a notice of appeal in conjunction with that order on July 9, 2025, the court never entered it on the docket, necessitating a remand from this Court to perfect jurisdiction over this appeal. On remand, we directed

*(Footnote Continued Next Page)*

pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546. Olivieri chiefly contends that his trial counsel was ineffective for failing to, *inter alia*, present expert testimony emphasizing the nonexistence of gunshot residue found on a hooded sweatshirt/jacket,[2] recovered from Oliveri's home, approximately forty-eight hours after the shooting deaths of the victim-decedents, S.D. and C.M. After a thorough review of the record, we conclude that Olivieri has failed to demonstrate any instance of ineffective assistance of counsel and affirm.

This matter has been previously remanded by a panel of this Court on one discrete averment contained in Olivieri's petition, "for further proceedings concerning [Olivieri's] claim that trial counsel was ineffective for failing to present expert testimony as to the lack of gunshot residue on a jacket that [he] allegedly wore on the night of the victims' deaths." **Commonwealth v. Olivieri**, 2496 WL 5199483 at *1 (Pa. Super., filed Dec. 23, 2024) (unpublished memorandum) (2494 & 2496 EDA 2023). We adopt that panel's recitation of the facts underpinning Olivieri's convictions:

---

the court to enter a final order on the docket. Accordingly, on November 20, 2025, the court entered a final order dismissing Olivieri's petition, rendering Olivieri's technically premature notice of appeal timely filed. **See** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").

[2] It was a known fact at trial that gunshot residue testing was performed on this jacket, which tested negative for the existence of said residue. The parties stipulated as much at trial. **See** N.T. Trial, 5/16/19, at 332.

From the spring to autumn of 2017, ... Olivieri, then aged sixteen years old, was a member of a juvenile friend group that included decedent [C.M.], [N.T.], and [J.H.]. This group, which spent their time near their homes at 12th and Tasker Streets in South Philadelphia, often engaged in acts of rivalry with other similarly[-]aged groups located further south, including a group associated with decedent [S.D.]. [S.D.'s] group spent time in the area of 12th and Ritner Streets, approximately one mile south of 12th and Tasker Streets.

Sometime between December 2016 and April 2017, Olivieri approached [S.D.] and his friend [E.P.] near the intersection of 12th and Porter Streets in South Philadelphia. During the encounter, Olivieri challenged [E.P.] to a fight, and [E.P.] punched Olivieri, knocking him to the ground.

Over the course of the subsequent months Olivieri maintained an Instagram account[,] which he used to participate in a group chat that included the decedent [C.M.], [N.T.], and [J.H.], among others. Olivieri used the group chat application to post messages and photos, including a photo of a silver .45 caliber pistol. On October 9, 2017, [N.T.] posted a photo to the group chat depicting a piece of feces on the sidewalk stating[,] "Brandon took a shit on opp territory," referring to the area south of Snyder Avenue in South Philadelphia where the decedent [S.D.] was located. Later that day, Olivieri requested that [N.T.] screenshot and send him an image of the decedent [S.D.] and his associates posted on [S.D.]'s Instagram profile. After [N.T.] did so, Olivieri responded that he would "pop all of them."

After school on October 24, 2017, Olivieri and [N.T.] met each other at Olivieri's house near the intersection of 12th and Tasker Streets. There, they smoked marijuana and loitered around before [N.T.] received a phone call from the decedent [C.M.] at approximately 7:00 p.m. During their conversation, [C.M.] indicated that he was looking to fight a group of Hispanic teenagers. Olivieri armed himself with the silver .45 caliber pistol that appeared in the previous Instagram photo, and travelled with [N.T.] to meet [C.M.] in the area of 9th and Federal Streets. Failing to find the group in question, Olivieri, [C.M.], and [N.T.] encountered [J.H.], and the four travelled to the area of 12th and Ritner Streets.

That evening, the decedent [S.D.] and his friends [A.Z.], [J.J.E.],

- 3 -

and ... [N.]D. were spending time together on a corner of the intersection of 12th and Ritner Streets. As Olivieri and his cohorts approached their location, [S.D.] recognized the group as "12th Street," while [A.Z.] recognized [C.M.] as a classmate in high school and Olivieri as someone he had met months prior. Upon reaching the intersection, [C.M.] told [A.Z.] that the corner was theirs now, and [S.D.] recognized Olivieri from the previous fight with [E.P.]. During this encounter, Olivieri and [S.D.] briefly spoke to each other, before Olivieri drew the .45 caliber pistol from his waistband. Seeing the pistol, [S.D.] lunged at Olivieri and attempted to disarm him. During the ensuing struggle, Olivieri fired three shots, with one round striking his friend [C.M.] and the final shot striking [S.D.].

During the shooting, [A.Z.] dove behind a car to avoid the gunfire. From there, he made eye contact with Olivieri, who put the firearm in his waistband before fleeing the scene of the shooting. Off-duty Philadelphia Police Officer Michael McKowan, who lived on the block where this incident occurred, passed the group while walking his dog ... immediately prior to the shooting. Upon hearing three gunshots, Officer McKowan turned around and saw [S.D.] running towards him, shouting, "you have to help me," before collapsing on the pavement in front of his own home. [Officer] McKowan quickly returned to his house to bring his dog inside, and on his way to that location, he spotted [C.M.] lying in front of a home at 1202 Ritner Street. Patrol officers began to arrive at the scene, and [Officer] McKowan assisted Officer Scanlon in placing the unresponsive [C.M.] in the back of a squad car for transport to Jefferson Hospital. Officers Lang and Kolenkiewicz attended to [S.D.] and transported him to the same location. After arriving at Jefferson [Hospital], [a doctor] pronounced [C.M.] and [S.D.] dead at 9:04 p.m. and 9:13 p.m., respectively .... At trial, Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, testified that ... for each decedent, the cause of death was a gunshot wound to the chest and the manner of dea[th] was homicide.

In the immediate chaos after the shooting, each of the teenagers scattered either north on 12th Street or east on Ritner Street. Upon hearing the second shot, [N.D.] ran from the area, and dropped his phone halfway down the block ... before running into a Starbucks and using a phone there to call his stepfather. Both [N.]D. and his stepfather returned to the scene of the shooting, where [N.]D. agreed to speak to the police. [A.Z.] also provided

a statement to detectives on October 24, 2017, but failed to identify Olivieri as the shooter.

... Upon searching the scene, [Philadelphia police detectives] recovered one projectile, three fired cartridge casings ("FCCs"), and identified cameras located at the nearby Star Mini Market. ... [Philadelphia police detectives] examined each bullet specimen and FCC and determined that the projectiles were each fired from the same .45 caliber firearm. [Philadelphia police detectives also] recovered video surveillance footage from multiple sources along 12th Street that depicted a group of teenagers running away from the area of the shooting, with Olivieri following shortly behind them.

Immediately after the shooting, [N.T.] made more than twenty phone calls in an attempt to contact both Olivieri and [C.M.]. Later that evening, during a conversation with [a] friend[,] [M.M.], [N.T.] discovered that [C.M.] had been shot.

The next day, [N.T.] visited Olivieri at Olivieri's home, whereupon Olivieri stated that he did not know how he could keep living with himself and that he had no intention to shoot [C.M.]. Olivieri later gave the firearm to his friend [R.O.,] who, the next day, gave the gun to [M.M.], who hid the gun in a safe under his bed.

On October 26, 2017, [N.T.] accompanied Olivieri to their friend [L.G.'s] home, and then the three travelled together to [R.O.'s] grandmother's home in Northeast Philadelphia, where Olivieri hoped to hide out for a time. After [N.T.] and [L.G.] returned to South Philadelphia, [R.O.] met with [M.M.] to dispose of the firearm. They were soon accompanied by [L.G.], who travelled with them to the Delaware River bank off Columbus Avenue, where they tossed the weapon into the river. As [M.M.], [R.O.], and [L.G.] travelled to the river to dispose of the pistol, [M.M.] engaged in a text message conversation with his paramour [A.H.], and during which he updated her on their progress.

Over the course of the investigation, [N.T.], [A.Z.], and [N].D. each provided statements to the police identifying Olivieri as a shooter. Though [A.Z.] stated that he did not recognize Olivieri during his October 24, 2017 interview, he spoke to members of [S.D.'s] family on October 26, 2017, and decided to provide police with an additional statement. That evening, [A.Z.] returned to the interview room, accompanied by an associate of the [S.D.] family

identified as "Chris," where [A.Z.] spoke to detectives. [A.Z.] later saw video surveillance footage of the aftermath of the shooting, and was able to identify Olivieri fleeing the area after the shooting.

In the ensuing weeks and months after the homicide, Philadelphia police detectives recovered cell phones from Olivieri, [N.T.], [L.G.], [M.M.], [A.H.], and each decedent. Detective Lucke, an expert in cell phone data extraction, secured warrants for the devices belonging to [M.M.] and [N.T.], and used data extraction software ... to extract all of the data from each device, including the contents of the deleted Instagram conversations leading up to the shooting and text messages sent by [M.M.] to [L.G.] and [A.H.] on October 26, 2017.

In the aftermath of the shooting, [N.T.] and Olivieri each deleted their Instagram accounts, causing records of their conversations to display the username "Instagrammer" as opposed to their unique identifiers. At trial, [N.T.] identified himself and Olivieri as the Instagram users responsible for certain messages in the group chat, and deciphered which message was composed by each individual.

*Id.* at *1-3 (quoting Trial Court Opinion, 9/18/19, at 2-8; some names modified; citation omitted).

Ultimately, Olivieri was

charged with C.M.'s and S.D.'s murders and firearms offenses. A jury found Olivieri guilty of first-degree murder regarding S.D. (CP-51-CR-0010999-2017), third-degree murder regarding C.M. (CP-51-CR-0010998-2017), and related firearms offenses. On July 22, 2019, the court imposed [a] sentence [of thirty-seven-years-to-life imprisonment for the first-degree murder and a concurrent sentence for the third-degree murder]. Olivieri filed a timely notice of appeal, and this Court affirmed Olivieri's judgment of sentence. [*See Commonwealth v. Olivieri*, 249 A.3d 672619 (Pa. Super. 2021) (table) (2231-32 EDA 2019).] On November 30, 2021, our Supreme Court denied Olivieri's petition for allowance of appeal. [*See Commonwealth v. Olivieri*, 268 A.3d 378 (Pa. 2021) (table) (221-22 EAL 2021).] Olivieri did not appeal to the United States Supreme Court. On August 29, 2022, Olivieri filed a timely PCRA petition at CP-51-CR-0010999-2017. On November 29, 2022, he timely filed an amended *pro se* PCRA

petition at both CP-51-CR-0010999-2017 and CP-51-CR-0010998-2017. On April 13, 2023, Olivieri filed a counseled, amended PCRA petition at both caption numbers through counsel. The PCRA court consolidated both PCRA petitions for purposes of disposition.

*Id.* at *3 (some names modified; footnote omitted). The court dismissed this consolidated petition in its entirety without a hearing on September 13, 2023.

Although he raised several issues in his petition, the court rejected Olivieri's particular "claim that trial counsel was ineffective to present expert testimony concerning the lack of gunshot residue[]" in a single paragraph, addressing a failure to proffer a certification or expert report for a proposed expert. *Id.* at *4. However, the record demonstrated that, "four months before the [PCRA] court dismissed [Olivieri's] petition, [Olivieri] submitted an expert report from Frederick Wentling on the gunshot residue issue." *Id.* at *5. That report "opined that the absence of gunshot residue on the jacket was inconsistent with the conclusion that [Olivieri] fired the shots on the night of the homicides." *Id.* As such, although we found that the court sufficiently discussed "the other issues raised [in the appeal from his PCRA petition]," *id.* at *5 n.2, a remand was required for the court to: "(1) address whether an evidentiary hearing [was] necessary in view of the opinion expressed in Wentling's expert report[;] (2) hold an evidentiary hearing if it determine[d] that one [was] necessary; and (3) grant or deny relief on the expert testimony issue." *Id.* at *5.

On remand, the PCRA court held an evidentiary hearing on March 13,

2025, and resultantly found that Olivieri's trial counsel was not ineffective on the gunshot residue issue. Thereafter, the court, for the second time, dismissed Olivieri's PCRA petition. On appeal, Olivieri presents issues germane to both the "sufficiently discussed" other allegations contained in his petition and initial appeal, as well as the gunshot residue contention, which the PCRA court has now heard.

On appeal, Olivieri presents the following questions for our review:

1.    Whether the PCRA [c]ourt erred in dismissing [] Olivieri's claim of trial counsel's ineffectiveness insofar as counsel failed to consult with and present the testimony of an expert witness in order that he could understand and inform the jury about the significance of gunshot residue evidence?

2.    Whether the PCRA [c]ourt erred in dismissing the remaining claims of trial counsel's ineffectiveness without a hearing?

3.    Whether the PCRA [c]ourt erred in dismissing [] Olivieri's claims of appellate counsel's ineffectiveness without a hearing?

Appellant's Brief at 10.[3]

As a preliminary matter, we first note our standard of review for an

_____

[3] Olivieri's brief violates Pennsylvania Rule of Appellate Procedure 2119(a) insofar as it raises three questions, but contains four, or arguably five, distinct argument sections. **See** Pa.R.A.P. 2119(a) ("The argument shall be divided *into as many parts as there are questions to be argued*; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.") (emphasis added). As Olivieri's contentions can be readily discerned from the text of his brief, we, although noting our displeasure, proceed to substantive review of the issues.

order denying post-conviction relief. Our review is limited to whether the record supports the PCRA court's determination and whether that decision is free of legal error. **See Commonwealth v. Beatty**, 207 A.3d 957, 960-61 (Pa. Super. 2019). We give great deference to the PCRA court's findings of fact if they find any support in the certified record; nevertheless, we do not give the same deference to the court's legal conclusions. **See id.**

All of Olivieri's assertions raise ineffective assistance of counsel concerns.[4] As such, the **Strickland**/**Pierce**[5] test applies:

> [W]e begin with the presumption counsel is effective. To prevail on an ineffectiveness claim, [an] appellant must satisfy, by a preponderance of the evidence, the performance and prejudice standard set forth in [**Strickland**]. In Pennsylvania, we have applied **Strickland** by looking to three elements an appellant must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) appellant suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different.

**Commonwealth v. Hannibal**, 156 A.3d 197, 206 (Pa. 2016) (citations and footnote omitted). If any prong fails under **Strickland**, the court may proceed

---

[4] PCRA relief may be sought if "the conviction or sentence resulted from … [i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii).

[5] **See Strickland v. Washington,** 466 U.S. 668 (1984); **see also Commonwealth v. Pierce**, 527 A.2d 973, 975 (Pa. 1987).

- 9 -

to review that one first. *See id*. at 207.

In Olivieri's first issue, he avers that counsel was ineffective for failing to consult with, and thereafter present at trial, an expert witness who would have opined that "the absence of gunshot residue [found on Olivieri's jacket] was inconsistent with [him] having fired a gun on the night in question[.]" Appellant's Brief at 24 (emphasis omitted). As part of the "arguable merit" prong, Olivieri suggests that such information would have been exculpatory, as it would have tended to establish, although not conclusively prove, his innocence. *See id.* at 23 *citing Commonwealth v. Hudgens*, 582 A.2d 1352, 1361 (Pa. Super. 1990). In other words, Olivieri emphasizes that evidence of the possible meaning underpinning the absence of gunshot residue would have been materially helpful to the defense's case. Nevertheless, while it would have helped his defense, Olivieri concedes that there is no mathematical certainty to the notion that he would have been less likely to be the shooter in the absence of gunshot residue on his jacket. *See* Appellant's Brief at 25.

As to the second prong, counsel's basis for action or inaction, Olivieri faults trial counsel's apparent lack of concession, at the PCRA hearing, as to whether counsel should have, at a minimum, merely consulted with a gunshot residue expert. *See* Appellant's Brief at 26 *citing* N.T. PCRA Hearing, 3/13/25, at 14-15 (trial counsel indicated that it would "depend on what the evidence is" as to whether an expert should be hired "to review materials"). Such a

consultation, Olivieri contends, would have been protected by attorney-client privilege. *See* Appellant's Brief at 26 ("[T]rial counsel would have been under no obligation to advise the Commonwealth [in the event the expert had given a disastrous opinion contrary to Olivieri's defense].). Furthermore, Olivieri points to trial counsel's testimony at the PCRA hearing, which he contends contained "assumptions about the value of the gunshot residue evidence [that] were incorrect." *Id.* at 29.

Regarding the third prong, prejudice, Olivieri argues that "the absence of an expert witness backfired marvelously." *Id.* at 30. Specifically, Olivieri suggests that "the Commonwealth was able to mislead the jury into thinking that merely wiping one's jacket sleeve was sufficient to remove gunshot residue[.]" *Id.* at 31. Nevertheless, Olivieri's gunshot residue expert, obtained for his PCRA proceedings, indicated that he was unaware "of any scientific literature studies or other authoritative sources supporting [the Commonwealth's witness's] suggestion that merely wiping one's hand on a garment would completely remove gunshot residue or make that residue undetectable." N.T. PCRA Hearing, 3/13/25, at 63. Moreover, Olivieri faults trial counsel for leaving "it up to the jury to use its common sense in interpreting the import of the [negative] gunshot residue tests[.]" Appellant's Brief at 32. However, through the testimony that had been elicited, "the Commonwealth was able to effectively downplay the significance of a critical fact: that Brandon Olivieri's jacket contained no evidence that he fired a pistol

on the night of the shooting." *Id.* at 33. We find that Olivieri failed to demonstrate ineffective assistance of counsel on this issue.

In particular, the PCRA court found trial counsel's trial strategy to reasonably effectuate his client's interests:

Trial counsel knew that any opportunity for an expert to educate the jury on gunshot residue would include educating the jury on the variety of ways that the gunshot residue could have been removed from the jacket, thus directing the jury's attention to unfavorable evidence.

Both experts [at the PCRA hearing] emphasized the importance of quickly collecting an item, preferably within minutes. Doing so ensures the item remains as close to its original condition as possible after the shooting incident, as the gunshot residue could otherwise be disturbed or tampered with. Here, the jacket was not recovered for forty-eight hours following the shooting incident. The shooting incident was on October 24, 2017, and the jacket was not recovered until two days later, on October 26, 2017.

Testimony from both experts highlighted the various ways that the jacket could have been disturbed from its original condition during that period. Immediately following the shooting, [Olivieri] ran from the scene of the crime after the shooting, which [Olivieri's] expert confirmed would affect the presence of gunshot residue. [Olivieri's] cell phone location indicated that he traveled to two different homes and rode the Broad Street Subway Line subway system after the shooting and before the jacket was recovered, all activities that can affect the presence of gunshot residue. The jacket was recovered from inside a living room closet in [Olivieri's] home. The jacket would have necessarily been disturbed from its original condition when [Olivieri] took it off and placed it in the closet.

The fact that [Olivieri] used a .45-caliber pistol could have affected the amount of gunshot residue produced during the shooting incident. Expert testimony explained that this gun would have produced fewer particles when fired compared to if [Olivieri] had fired a revolver. Fewer particles produced during the shooting incident would have limited how much gunshot residue would have transferred to the jacket during the shooting incident, which

- 12 -

would have been affected by subsequent activity. The jacket material resembles a windbreaker, with smoother material. Both experts confirmed that fabric type can affect how the item holds gunshot residue with smoother material allowing easier removal of residue. Consequently, any benefit from a gunshot residue expert regarding the significance of the absence of gunshot residue could have been quickly outweighed when considering the facts of this case.

PCRA Court Opinion, 6/18/25, at 5-6 (record citations omitted).

Moreover, as the Commonwealth points out, "[t]he jury was informed that *no forensic evidence*, including gunshot residue, was found on the jacket, and [Olivieri's trial] counsel stressed that lack of forensic evidence in his closing. The Commonwealth did not present a forensic expert in relation to the jacket[] and even agreed to stipulate that no forensic evidence was recovered." Commonwealth's Brief at 12 (emphasis in original). The Commonwealth's witness at trial also went into detail as to the possibility that, when one fires a gun, gunshot residue may be able to "be picked up on somebody's hands or clothing." N.T. Trial, 5/16/19, at 281. Moreover, at the PCRA hearing, trial counsel unequivocally stated that there "was no forensic evidence that [he] would need to call a scientist to review." N.T. PCRA Hearing, 3/13/25, at 14-15. Trial counsel continued by indicating that he did not want to call an expert because it would have placed more emphasis on the fact that the jacket was not recovered for "two or three days after the incident where gunpowder [*sic*] could have been removed or cleaned[.]" *Id.* at 25. Olivieri's expert also conceded that gunshot residue can be "removed by abrasion[ and] washing[; it can] fall-off, [when it] come[s] into contact with [an]other

object." *Id.* at 73.

We agree with the notion, outlined in the Commonwealth's brief, *see* Commonwealth's Brief at 13, that because it was known, and emphasized, at trial as to there having been no gunshot residue observed on Olivieri's jacket, the import of that fact was readily discernable to the jury without the need for further qualification by an expert witness testifying as to the *absence* of evidence. Thus, there was no prejudice. Moreover, as adduced at the PCRA hearing, such an expert could have weakened trial counsel's position, highlighting the time between the homicides and the point of recovery of the jacket several days later. Furthermore, most, if not all, of the testimony as to the science behind gunshot residue was heard by the jury through the Commonwealth's witness, rendering much of the expert testimony provided at the PCRA hearing cumulative.

Although, perhaps, trial counsel could have, at a minimum, consulted with a gunshot residue expert for more information, the fact remains that *there was no affirmative evidence for this hypothetical expert to analyze*. Distilled down, through this consultation, trial counsel would have merely confirmed what had already been commonly known and presented at trial: the absence of gunshot residue made it indefinably less likely that Olivieri was the shooter. Nevertheless, the jury inevitably heard this information as to the lack of firearm residue on the jacket and still decided to convict, which was predicated, at least in part, on "powerful independent evidence[,]" notably

Olivieri's "own confession" and "the testimony of two eyewitnesses[.]" Commonwealth's Brief at 14. In short, because presentation of this expert at trial would have either been redundant, and thus not prejudicial, or served to undermine trial counsel's own strategy, demonstrating counsel had a reasonable basis for his inaction, we find that Olivieri failed to demonstrate ineffective assistance of counsel.

In his second ineffective assistance of counsel claim, Olivieri suggests that trial counsel should have elicited exculpatory testimony from an eyewitness, N.D., a thirteen-year-old, who indicated the shooter was wearing different clothing than what another Commonwealth witness, A.Z., had indicated Olivieri was wearing on the night of the shootings. *See* Appellant's Brief at 34. A.Z. testified that Olivieri had been wearing "[a] navy blue silk hoodie and jeans." N.T. Jury Trial, 5/14/19, at 199. The jacket that had been recovered from Olivieri's residence was also navy blue. Conversely, N.D.'s police statement indicated that the shooter "was white[,] and he had a grey hood[ie.]" N.D. Police Statement, 10/24/17, at 3. Although N.D. testified at trial, he did not make an identification of Olivieri as the shooter. Olivieri faults trial counsel for having not "question[ed] him on [his earlier description of the shooter] or attempt to put this description into evidence." Appellant's Brief at 36. Moreover, he alleges that counsel had no reasonable basis to not ask N.D. about his police statement. Finally, Olivieri asserts that he suffered prejudice because, if N.D.'s testimony had been believed, it would have made his

conviction an impossibility, as he would have been wearing clothing distinct from that of the shooter. *See id.* at 38.

The PCRA court concluded that Olivieri failed to demonstrate ineffective assistance of counsel with respect to this claim:

> [Olivieri's] claim that trial counsel was ineffective for failing to ask N.D. about his description of the shooter's clothing as a "grey hoodie" fails as [Olivieri] has not provided a signed certification from N.D. Merely assuming that he would have testified consistent with his police statement is insufficient to establish a basis for relief.
>
> Even if N.D. would have testified that the shooter was wearing a different color jacket than the one described by A.Z., [Olivieri] suffered no prejudice from its absence. N.D. didn't know [Olivieri] and couldn't identify him as the shooter, but he stated that the shooter was running directly behind him after the shooting[,] and surveillance video showed that [Olivieri] was the person running behind him that night. N.D.'s testimony was corroborated by the physical evidence presented at trial and the testimony of N.T. and A.Z. There was also overwhelming evidence of [Olivieri's] guilt independent of N.D.'s testimony, specifically [Olivieri's] confessions to his friends and A.Z.'s identification of the shooter.

PCRA Court Opinion, 9/7/23, at 9-10 (footnote omitted).

N.D.'s trial testimony established that he did not know what victim S.D., with whom he was familiar and was next to, was wearing on the night of the shootings. *See* N.T. Trial, 5/15/19, at 217. N.D. had been paying attention to A.Z. and C.M. *See id.* at 204. Then, after hearing gunfire, N.D. ran away from the scene. *See id.* at 206.

The Commonwealth posits that, if N.D. "had testified as [Olivieri now] asserts, it would have potentially *undermined* his strategy regarding the lack of gunshot residue on the *blue* hoodie." Commonwealth's Brief at 15

(emphasis in original).[6] Furthermore, not only did A.Z. testify that Olivieri was wearing the navy-blue silk hoodie, consistent with his admission above, but also, he identified Olivieri from a security footage video. ***See*** N.T. Trial, 5/14/19, at 199, 206. Another witness, N.T., testified that Olivieri was the shooter and was wearing "a hoodie[,] but like varsity material." ***Id.***, 5/15/19, at 44, 62. N.T. identified Olivieri in the security footage played at trial. ***See id.*** at 65.

After our review, we conclude that Olivieri fails to establish the reasonable basis prong of the ineffectiveness test because absent any indication that N.D.'s testimony would have been consistent with his description given to police two years before trial, it was not unreasonable for trial counsel to proceed with his theory of the case, i.e., that the recovered jacket contained no gunshot residue and therefore Olivieri could not have been the shooter. Placing Olivieri at the scene with different clothing on would have served to undermine that strategy, leading to possible jury confusion. Accordingly, counsel was not ineffective for failing to adduce N.D.'s testimony as to his description of the shooter, especially where N.D. stated that the shooter was running behind him, and the video demonstrated that Olivieri ran

_____

[6] Although counsel would have been free to explore this potentially exculpatory avenue, because of the converse risk associated with it, such a diametrically opposed elicitation, and its potential impact on the jury, would certainly go to the reasonableness of counsel's strategy.

behind N.D.

In his third ineffective assistance of counsel claim, Olivieri avers that trial counsel was ineffective for failing to call Robert Palmisano[7] as an exculpatory witness. Olivieri contends that the PCRA court should have held an evidentiary hearing on this claim, given that Palmisano "gave a statement to police recounting a conversation that he had with [A.Z.] shortly after the shooting where [A.Z.] identified [N.T., rather than Olivieri,] as the shooter." Appellant's Brief at 41.

Olivieri indicates that A.Z. originally "gave an inconsistent statement to police disclaiming any knowledge of the shooting[,]" *id.*, wherein "he denied knowing what happened and who was responsible for the shooting." *Id.* at 41 n.12. However, A.Z. then went back to the police station and identified Olivieri as the shooter, ultimately providing "some of the most devastating testimony" at trial, specifically identifying in front of the jury "Olivieri as the person who shot and killed both S.D. and C.M." *Id.* at 41. Trial counsel "pointed out that [A.Z.] lied to police[.]" *Id.* at 42.

One day after the shootings, Palmisano provided a statement to police wherein he "told police that [N.T.] was the shooter. Palmisano claimed to have learned everything that he knew from [A.Z.] notwithstanding the fact that

---

[7] Robert Palmisano is alternatively spelled Robert Palisano in the record. *See* N.T. Trial, 5/13/25, at 35.

[A.Z.] claimed to know nothing when he was interviewed by police the day before." *Id.* In Palmisano's police statement, he indicated that, although he, himself, was not present when the murders occurred, A.Z. "told [him] he was present during the murder. [A.Z.] told [him] that he was close enough to hear the argument and then [he] saw [Olivieri] pull out a gun and hand it over to [N.T]. [A.Z.] said [N.T.] then shot [S.D.] who fell to the ground." Robert Palmisano Police Statement, 10/25/17, at 1.

Olivieri asserts that Palmisano's statement "exculpated" him. Appellant's Brief at 43. Olivieri also asserts that there was no impediment at trial in calling Palmisano as a witness. *See id.* at 43-45. Finally, Olivieri suggests that "it is[,] at best[,] unclear whether [A.Z.'s] inconsistent statement would have been admissible for its truth. Quite simply, the record was not sufficiently developed to allow for a determination as to whether [A.Z's] statement to Palmisano was admissible for its truth or merely for impeachment purposes." *Id.* at 49. Further, regarding the statement's admissibility, Olivieri believes that, given the close temporal proximity between the shootings and when Palmisano and A.Z. had this alleged conversation, when coupled with the "shocking, startling[,] and upsetting" nature of the shootings, "[t]hese statements could very well have been [admitted] as either excited utterances or present sense impressions." *Id.* at 50 (citations omitted). Even if the statement was not admissible for its truth, Olivieri suggests that Palmisano's testimony "would nevertheless have been

admissible to prove that [A.Z.] actually made that inconsistent, irreconcilable statement." **Id.** at 50-51.

The court disposed of this specific ineffective assistance of counsel claim as follows:

> Baldly claiming that trial counsel was ineffective for failing to call Robert Palmisano to impeach A.Z. because he could have subpoenaed him is insufficient to establish that Palmisano was available and willing to testify for the defense.
>
> Contrary to [Olivieri's] assertions, [Olivieri's] certification actually shows that Palmisano was not available and willing to testify on behalf of [Olivieri]. In his statement to [Olivieri's] investigator, Palmisano stated that he could not recall who A.Z. was or any conversation he had with A.Z. Subsequent to [Olivieri's] trial, Palmisano suffered a head injury[,] which resulted in memory loss. [Olivieri] alleges, without any supporting evidence, that Palmisano is being pressured to avoid coming forward or to falsely claim that he does not have memory of the events.
>
> Even if he could prove that Palmisano was available and willing to testify at the time of trial, [Olivieri] did not suffer prejudice [from] the absence of his testimony. At trial, evidence was introduced which established that [Olivieri] confessed to shooting the decedents to his friends, N.T. and M.M., and that [Olivieri] gave the murder weapon to R.O., who then gave it to M.M. to be hidden and later disposed of in a river. Additionally, A.Z. testified that [Olivieri] shot the decedents. In his October 25, 2017 police statement, Palmisano stated that A.Z. told him that [Olivieri] gave the firearm to [N.T.] who then immediately shot S.D. This portion of Palmisano's statement would only have been admissible as impeachment evidence against A.Z. and not for the truth of the matter asserted because it is inadmissible hearsay evidence with no applicable exception.
>
> At trial, A.Z. was extensively impeached during cross-examination because his testimony contradicted his initial statement to police on October 24, 2017, in which he did not identify [Olivieri] as the shooter. A.Z. was further impeached by trial counsel regarding his description of the murder weapon and [Olivieri's] clothing during the shooting. In light of A.Z.'s extensive impeachment, additional

- 20 -

impeachment evidence would have had a *de minim*[*i*]*s* impact on [Olivieri's] trial. Furthermore, at trial, A.Z. denied knowing Palmisano and denied ever claiming he said N.T. was the shooter.

PCRA Court Opinion, 9/7/23, at 8-9 (record and case citations omitted).

When interviewed by an investigator hired on behalf of Olivieri's current counsel, Palmisano indicated that he had no idea what the investigator was talking about. **See** Interview with Palmisano, 7/18/23. Palmisano "had multiple seizures and [has] no memory o[f the shooting.]" ***Id.*** Palmisano, himself, had been, after Olivieri's trial, "shot in [the] head and the bullet is still in [his] head, so it potentially gives [him] seizures[,] and [he] pretty much forget[s] everything." ***Id.*** Palmisano indicated that he did not want to testify in court. **See *id.*** When asked about A.Z., Palmisano stated that he did not recall "any such person by that name and that he doesn't recall anything that this person may have told him shortly after the incident in question[.]" ***Id.***

After our review, Olivieri has failed to demonstrate, *inter alia*, that counsel's inaction, having failed to call Palmisano at Olivieri's trial, lacked a reasonable basis insofar as Palmisano's statement to the police constituted nothing more than inadmissible hearsay. Therefore, a hearing was not necessary to establish whether there was a genuine issue of material fact, given that the underlying contention, seeking the admission of the thrust of Palmisano's police statement, is without merit. Even if the at-issue statement were to have been submitted solely for impeachment purposes, the PCRA court correctly highlights that such information would have been redundant to

other impeachment evidence admitted during A.Z.'s cross-examination; thus, Olivieri also failed to establish prejudice. As such, based primarily on either the inadmissibility or redundancy inherent to Palmisano's police statement, counsel was not ineffective for failing to call Palmisano at Olivieri's trial.[8]

In his fourth issue, Olivieri submits that he suffered cumulative prejudice. *See* Appellant's Brief at 52. Olivieri collates the already-mentioned topics that trial counsel allegedly failed to explore: (1) the absence of gunshot residue found on his jacket and its significance; (2) A.Z.'s statement, through Palmisano's police statement, that N.T. was the shooter; and (3) N.D.'s description of the shooter's clothing that did not align with what Olivieri had been wearing that evening. *See* Appellant's Brief at 52. Olivieri suggests that "[a]ll of this was evidence that was available but not presented[,] exculpated [himself] and inculpated [N.T.]" *Id.*

Given that we have found no indication that Olivieri received ineffective assistance of trial counsel at any of the discrete issues raised above, his cumulative prejudice claim necessarily fails. *See Commonwealth v.*

---

[8] Furthermore, there is the inescapable fact that, based on the present record, Palmisano does not currently remember anything about the shooting incident or anything that occurred thereafter and further does not want to testify. As such, to the extent Olivieri wished to utilize Palmisano in PCRA proceedings and potentially beyond that, his existence provides no discernable benefit to Olivieri moving forward. In his current state, it is unclear, while possibly damaging, precisely how Palmisano would have testified had he had been presented as a witness at Olivieri's trial.

*Johnson*, 966 A.2d 523, 532 (Pa. 2009) ("[N]o number of failed [ineffectiveness] claims may collectively warrant relief if they fail to do so individually.") (citation omitted). Nevertheless, "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Id.* (citation omitted). However, here, Olivieri merely reasserts the same bases which we have conclusively found that counsel was not deficient. Accordingly, Olivieri is due no relief.

In his fifth and final issue, Olivieri argues that appellate counsel was ineffective for failing to raise a sufficiency of evidence claim in his direct appeal as to his first-degree murder conviction. Specifically, Olivieri suggests that, "[w]hile the evidence at trial could undoubtedly support an inference of a high degree of recklessness or even perhaps malice, the evidence simply cannot be said [to] support a finding that [] Olivieri intended to take the life of anyone on the night of the shooting." Appellant's Brief at 55; *see also* 18 Pa.C.S. § 2502(a) (defining first-degree murder as having been "committed by an intentional killing[]"); *Commonwealth v. Houser*, 18 A.3d 1128, 1133 (Pa. 2011) (to prove first-degree murder, the "Commonwealth must prove: a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill[]") (citations omitted).

As to our standard of review for sufficiency of evidence challenges, we employ the following:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for a fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Haahs*, 289 A.3d 100, 104 n.2 (Pa. Super. 2022) (citation omitted).

The substance of Olivieri's sufficiency contention is limited to two sentences. *See* Appellant's Brief at 55. He summarily concludes that "appellate counsel had no reasonable basis for failing to include the claim in [his] direct appeal" and that "the evidence was actually insufficient to prove first[-]degree murder." *Id.* Finally, Olivieri alleges prejudice insofar as he "lost the opportunity to have the grading of his crime reduced and/or an arrest of judgment." *Id.* at 56.

Despite his bald assertions, appellate counsel had a reasonable basis to not raise a sufficiency claim on appeal because it fundamentally had no merit. The evidence adduced at trial established that Olivieri committed the

shootings. *See, e.g.*, N.T. Trial, 5/15/19, at 44 (N.T. testifying that Olivieri shot both S.D. and C.M.). N.T. testified that Olivieri, himself, and others went to where the shootings occurred to try and "start trouble." *Id.* at 54. Olivieri was the individual who acquired the gun, a .45-caliber firearm, which was kept mainly at Olivieri's house. *See id.* at 43. Olivieri possessed that firearm on his person the night of the shootings. *See id*. at 44. N.T. also testified that Olivieri indirectly responded to one of S.D.'s Instagram posts, featuring a photograph of S.D. and others, in which Olivieri said that he "will pop all of them[,]" which N.T. understood to mean "shoot[]" them. *See id*. at 33-34. In addition, as previously has been stated, A.Z. also identified Olivieri as the shooter.

Viewing this evidence in a light most favorable to the Commonwealth as verdict winner, when coupled with Olivieri's own confession to M.M., *see* N.T. Trial, 5/16/19, at 18-19 (M.M.'s testimony: "[Olivieri] said an argument broke out[,] and [Olivieri] said he pulled the gun out. [Olivieri] and [S.D.] started fighting over the gun[,] and it went off while they were fighting with the gun and [C.M.] got hit. Then[, Olivieri] pulled for the gun to get away[,] and [S.D.] got hit."), a sufficiency claim would have been unmeritorious, if not wholly frivolous. Accordingly, appellate counsel had a reasonable basis for his actions and counsel was not ineffective for having not raised the sufficiency claim in Olivieri's direct appeal.

As we have found none of Olivieri's assertions to warrant relief, we affirm the PCRA court order dismissing his petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/27/2026